IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 18, 2016 Session

**CHERYL ELLEN MOUTON v. MICHAEL J. MOUTON**

**Appeal from the Circuit Court for Hamilton County**
**No. 13-D-351          W. Neil Thomas, III, Judge**
_____

**No. E2016-00231-COA-R3-CV-FILED-NOVEMBER 16, 2016**
_____

In this parental relocation case, the trial court erred in finding that the mother did not have a reasonable purpose in relocating to another state for her employment. Furthermore, mother's purpose in relocating was not vindictive. Therefore, the judgment of the trial court is reversed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. , J., and THOMAS R. FRIERSON, II, J., joined.

Bill W. Pemerton, Chattanooga, Tennessee, for the appellant, Cheryl Ellen Mouton.

Steven Mark Jacoway, Chattanooga, Tennessee, for the appellee, Michael J. Mouton.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Michael J. Mouton ("Father") and Cheryl Ellen Mouton ("Mother") were married in Colorado in 2005 and moved from Littleton, Colorado to Chattanooga, Tennessee in 2011. They had two children, Zoe and Triston, ages fifteen and seven, respectively, at the time of trial. Zoe was the child of Father from a prior marriage and Mother adopted her. About six months after moving to Chattanooga, the parties separated, and Mother filed for divorce on February 5, 2013.

The parties were divorced by final decree entered on May 26, 2015. The permanent parenting plan provided that Father was the primary residential parent for Zoe

with 280 days of parenting time per year and that Mother was the primary residential parent for Triston with 280 days of parenting time per year. Because the parents had "relatively equal annual incomes" and each was the primary residential parent of one child, the trial court did not order either to pay child support.

Mother worked for Healthgrades in Chattanooga as Director of Client Development at an annual salary of $80,000. In June 2015, she lost her job at Healthgrades. In a letter dated August 12, 2015, Mother notified Father of her intention to relocate to Littleton, Colorado with Triston. Mother stated that she had been offered a job as Director of Marketing and Consulting with Ethos in Denver. She anticipated that she would also be offered a job in Denver with HCA as Vice President of Quality and Performance Measures and with E2 Optics as a business development strategist. The move would also allow Mother to be close to her family.

Father filed a petition in opposition to Mother's removal of the child, for modification of the primary residential parent, and for contempt on September 10, 2015. Nevertheless, Mother moved to Colorado with Triston on or about September 18, 2015. On October 23, 2015, the trial court ordered Mother to return Triston to the jurisdiction of the court; the court also ordered that the child would remain in the jurisdiction under further order of the court. The court entered a second order providing that, if Mother did not return Triston to the jurisdiction by 5:00 p.m. on October 30, 2015, Father would be temporarily designated as the primary residential parent and would take immediate physical custody of the child. Mother returned with Triston to Chattanooga as ordered on October 30, 2015.

The case was tried on January 5 and 6, 2015, and there were only three witnesses: Father, Mother, and Bill Younkes, Mother's prospective employer in Colorado. Father's proof consisted of one witness, himself. He testified about the history of the parties' relationship and their interactions concerning the children since the divorce. Father gave details about disagreements between the parties regarding visitation. He also testified about an order of protection and a criminal warrant Mother obtained against him, both of which were ultimately dismissed. Father asserted that Mother frequently would not allow him to speak to Triston on the telephone.

When asked what effect he thought it would have on his relationship with Triston if the court allowed Mother to relocate to Colorado, Father testified as follows:

> A. I just honestly see it as just being impossible. I mean, it is—it's been so hard to communicate with my son here when they're here or—even with court orders. And it's just—even when they move—go away, like she left and moved four times, I think. Four or five times I spoke to him in seven weeks I think it was. I mean, that's just—that's ridiculous. And even me not getting him for Christmas and there's a court order. . . .

- 2 -

Q.  What—how will it affect his contact or relationship with his sister, Zoe?
A.  In the same way, you know, because the only time we get to speak with him is when he calls, you know.  That's it.  And who knows when that is.  We text, please have Triston call me, please have Triston call me, please have Triston call me, please have Triston call me, you know.  And nothing.  . . . Obviously, I want to see my son and I'm just not able to or communicate with him.  And, I mean, I'm his father, you know.

Father opined that the cost of living in Denver, Colorado was "definitely higher" than the cost of living in Chattanooga.  According to his research, the cost of living was 31% higher in Denver than in Chattanooga.  At the time of trial, Mother's parents lived in Colorado Springs, and her brother also lived in Colorado.  Father's sister and her family lived in Atlanta, and Father stated that Triston enjoyed seeing his cousins in Atlanta (three boys aged nine, thirteen, and fourteen) once a month.  The rest of Father's family lived in Louisiana and Texas.  Triston's maternal great-grandmother and her family lived in Chattanooga.

On cross-examination, Father was asked about Mother's stated purpose of relocating for a job:

Q.  . . .  And when I asked you in deposition regarding the reasonable purpose for Ms. Mouton's move, you had not looked at any job opportunities that may be available to Ms. Mouton; did you?
A.  No.
Q.  And you did not do any research on the job market regarding Ms. Mouton's skills, experience, or background; correct?
A.  Correct.
Q.  In fact, you did no research on the job market with regards to anything Ms. Mouton may or may not have been able to do in terms of employment; correct?
A.  In Colorado?
Q.  In the Chattanooga area.
A.  Oh, yes.
Q.  You did?
A.  No, no.  I did not.
Q.  And I asked you specifically in deposition . . . you have not done any research or looked at any job listings or have any proof that there are opportunities available in this area that would fit Ms. Mouton's background and expertise?
        Answer:  No, besides her saying yesterday that there were some.
        Question:  But you yourself have no proof?
        Answer:  I have no proof.
A.  Right.

. . . .

Q. And as you sit here today, you still have no proof that there are opportunities that exist for Ms. Mouton in this areas [sic] in terms of jobs; right?

A. Right.

Father was further questioned regarding his allegation that Mother's purpose in moving was vindictive. He acknowledged that Mother's reason for not allowing Triston to have overnights was that Father's girlfriend/fiancée was spending the night, contrary to the terms of the permanent parenting plan. Father admitted that, in her deposition testimony, Mother stated that she had no intention of depriving him of any days of parenting time with Triston, only to "reshuffle" them to make it possible for her to relocate and that Father could spend even more time with Triston if he came to Colorado to vacation with him. Father then testified:

A. I don't think monetary [regarding the expense of traveling] is the issue. I think repetitive time, frequent time with my son is the issue and the value of what my concern is. I think seeing my son physically for two weeks in the summer or three weeks in the summer cannot compare to being with him every week. There is so much lost there that I'm not willing to lose.

Q. But you would agree with me that you would be able to exercise the same or more days under Ms. Mouton's plan; correct?

A. The way it is now with how she is allowing? No, I don't agree with you. She doesn't allow time here. How—and when she moved away, I didn't get to see him. So I don't think—I'm not going to agree with you.

Father later testified that he questioned Mother's motives:

I don't think Triston's mental wellbeing is intact right now. I think he's being manipulated, being coerced, being lied to. I think he's being sheltered from me, pulled away from me and his sister. I don't think that's good parenting.

At the end of Father's proof, Mother moved to dismiss, asserting that Father had failed to meet his burden of proving that Mother's proposed relocation was not for a reasonable purpose, Tenn. Code Ann. § 36-6-108(d)(1)(A), or that Mother's motive for relocation was vindictive. Tenn. Code Ann. § 36-6-108(d)(1)(C).[1] The trial court decided to exercise its discretion under Tenn. R. Civ. P. 41.02(2) to defer its decision until it had heard all of the evidence.

---

[1] Father conceded that there was no evidence of a "threat of specific and serious harm to the child." Tenn. Code Ann. § 36-6-108(d)(1)(B).

- 4 -

Mother then put on her proof, beginning with her own testimony. She described the interactions between the parties regarding Triston and stated that Father often asked for last-minute changes in the parenting schedule. Mother testified that she decided to relocate to Colorado because she lost her job at Healthgrades due to an executive turnover. Once she knew that she was going to lose her job, in December 2014, she began looking for another job in Chattanooga and the North Atlanta area in business development, medical device sales, and hospital administration. Mother testified that she applied for hundreds of jobs; she also enlisted recruiters to help her. She did not get any offers within her field of expertise. She did get an offer from ADS Security at a salary of $45,000 a year, significantly less than she was earning at Healthgrades.

At the same time that she received the ADS Security offer, Mother received an offer to work at VITAL Marketing in Colorado as the Director of Marketing at a base salary of $60,000 to $80,000. She also started having conversations with Bill Younkes, whom she knew from his former position as the CEO of a company in Colorado at which she had worked. He was an entrepreneur who had started a number of companies. Mother described the opportunity with Mr. Younkes as follows:

> A. We're starting three different companies. One is Mentis Health Partners, which is an LLC. And then underneath that, we have a nonprofit, which is the Coalition for Sepsis Survival. And then another one I can't say yet because we haven't got all the trademarks on it yet. But it's health care, and it's in development of a coalition across the sepsis mortality rates within the State of Colorado. And then we're going state by state. We're working with different legislations. We're putting together different business models of bringing the hospitals—the hospital associations together, the different CMS and regulatory agencies as well to help decrease sepsis mortality rates across each state.
> Q. So sounds like it's in your business development field.
> A. Absolutely, yes, sir. And my expert knowledge around, you now, sepsis and quality initiatives and working with CMS in my previous roles.

Mother admitted that she had not yet made any money but had been volunteering her time to do the research necessary to write a grant proposal and other projects necessary to get the enterprise off the ground. Under the anticipated pay structure, she would make a base salary of $150,000 to $175,000 per year. Mother testified that the team working on this project had secured some funding from private investors and corporate sponsorships. She knew they had in excess of a million dollars to date.

Mother testified that, when she first moved back to Colorado, she worked for VITAL Marketing, but she was unable to keep that position because she had to move back to Chattanooga in compliance with a court order. When asked to compare the cost of living in Littleton, Colorado and Chattanooga, Tennessee, Mother stated that "Littleton

is a little bit more expensive just because it is Colorado."

Mother also offered the testimony of Bill Younkes, the entrepreneur who started the commercial company and the nonprofit organization for which Mother had been volunteering her time. Mr. Younkes testified that Mother "has been assisting me in developing the sales and marketing plan" for both entities. He stated that Mother would become a partner-employee in the commercial company beginning at the beginning of February. He estimated that her base salary would be $60,000 to $70,000 a year with the opportunity to earn double that amount through bonuses. Mr. Younkes stated that Mother's position would be finalized in the next week or two. Mother would also have some type of equity interest in the company.

Decision of Trial Court

In a memorandum and order filed on January 11, 2016, the trial court focused upon the lack of experience of Ms. Mouton's prospective employer "in the proposed line of business: consulting services to hospital patients in connection with reducing their morbidity percentage at medical institutions through the prevention of sepsis." Based upon the totality of the evidence, including all of the evidence concerning Ms. Mouton's prospective employer, the trial court could not "find a reasonable basis for the move."

On the issue of vindictiveness, the trial court found that the proof showed that Mother had "always encouraged the relationship between Triston and his father and that there certainly is no pattern by [Mother] unreasonably to disrupt or refuse any parenting time that [Father] was entitled to." The trial court concluded that "vindictiveness was not the motivating factor for the move."

The court proceeded to the best interest analysis and determined that it was not in Triston's best interest to move with Mother to Colorado. Father's petition opposing Mother's request to relocate with the minor child was granted.

On appeal, Mother asserts that the trial court erred (1) in finding no reasonable purpose for her proposed relocation; (2) in concluding that the proposed relocation was not in Triston's best interest; and (3) in denying her motion to dismiss Father's petition at the close of his proof. Father argues that the trial court erred in failing to find that Mother's motive in relocating was vindictive. Mother further requests that this Court award her reasonable attorney fees on appeal.

STANDARD OF REVIEW

We review the trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d). We give great weight to the trial court's credibility determinations because the

- 6 -

trial court is in the best position to assess witnesses' demeanor. *C & W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676 (Tenn. Ct. App. 2007); *Robinson v. Robinson*, No. M2003-02289-COA-R3-CV, 2005 WL 1541861, at *2 (Tenn. Ct. App. June 30, 2005). Questions of law are reviewed de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

ANALYSIS

Parent relocations often create wrenching situations: one parent loses regular parenting time with the child(ren) as a result of the other parent's move. This Court has previously stated:

> "One of the most common post-divorce flashpoints occurs when the primary residential parent decides to move with his or her child or children to another city or state. The farther the move, the more intense the opposition because of the move's effect on visitation and the ability of the other parent to foster and maintain an appropriate relationship with his or her child or children."

*Rudd v. Gonzalez*, No. M2012-02714-COA-R3-CV, 2014 WL 872816, at *7 (Tenn. Ct. App. Feb. 28, 2014) (quoting *Collins v. Coode*, No. M2002-02557-COA-R3-CV, 2004 WL 904097, at *2 (Tenn. Ct. App. Apr. 27, 2004)).

Our legislature has created a statutory framework to address parental relocation. *See* Tenn. Code Ann. § 36-6-108. The appropriate analysis depends upon the relative amount of time the parents spend with the child(ren). In the present case, Mother spends substantially more time with Triston than does Father; therefore, the applicable statutory provision is Tenn. Code Ann. § 36-6-108(d)(1):

> If the parents are not actually spending substantially equal intervals of time with the child and the parent spending the greater amount of time with the child proposes to relocate with the child, the other parent may, within thirty (30) days of receipt of the notice, file a petition in opposition to removal of the child. The other parent may not attempt to relocate with the child unless expressly authorized to do so by the court pursuant to a change of custody or primary custodial responsibility. The parent spending the greater amount of time with the child *shall be permitted to relocate with the child unless* the court finds:
> (A) The relocation does not have a reasonable purpose;
> (B) The relocation would pose a threat of specific and serious harm to the child that outweighs the threat of harm to the child of a change of custody; or
> (C) The parent's motive for relocating with the child is vindictive in that it

- 7 -

> is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

(Emphasis added). Thus, if the parents do not spend substantially equal intervals of time with the child, there is "'a legislatively mandated presumption in favor of [the] relocating custodial parent . . . .'" *Redmon v. Redmon*, No. W2013-01017-COA-R3-CV, 2014 WL 1694708, at *5 (Tenn. Ct. App. Apr. 29, 2014) (quoting *Collins*, 2004 WL 904097, at *2). The burden is on the parent opposing the relocation to prove one of the three statutory grounds. *See Clark v. Clark*, No. M2002-03071-COA-R3-CV, 2003 WL 23094000, at *3 (Tenn. Ct. App. Dec. 30, 2003). If the opposing parent fails to do so, the court must allow the relocation. Tenn. Code Ann. § 36-1-108(d)(1).

### Reasonable purpose

In this case, then, we must determine whether the trial court erred in finding that Father met his burden of proof to establish that Mother's proposed relocation was not for a reasonable purpose.

Determinations of "whether a proposed move has a reasonable purpose are fact-intensive and require a thorough examination of the unique circumstances of each case." *In re Spencer E.*, No. M2009-02572-COA-R3-JV, 2011 WL 295896, at *11 (Tenn. Ct. App. Jan. 20, 2011); *see also Rudd*, 2014 WL 872816, at *11. As we have consistently held, "a salary increase and career advancement opportunities 'can be a factual predicate to constitute a reasonable purpose for relocation.'" *Webb v. Webb*, No. E2008-00862-COA-R3-CV, 2009 WL 348362, at *2 (Tenn. Ct. App. Feb. 11, 2009) (quoting *Roberts v. Roberts*, No. E2005-01175-COA-R3-CV, 2005 WL 2860199, at *6 (Tenn. Ct. App. Oct. 31, 2005)). We have also stated, however, that there must be more than "a mere hope or belief of a better opportunity or a salary increase." *Id.* Other pertinent economic factors include "the relative significance of the [salary] increase, the cost of living in the proposed location compared to the present location, the firmness of the job offer, opportunity for career advancement and economic betterment of the family unit." *Slaton v. Ray*, No. M2004-01809-COA-R3-CV, 2005 WL 2756076, at *3 (Tenn. Ct. App. Oct. 24, 2005).

In finding no reasonable purpose, the trial court focused almost exclusively upon Mother's prospective employer, reasoning that the courts impose an implicit "requirement that there be some certainty with respect to the entity making the offer of employment." The trial court found that Mr. Younkes had no experience in the particular type of business being developed, namely "consulting services to hospital patients in connection with reducing their morbidity percentage at medical institutions through the prevention of sepsis." While commending the objective of the company as "promising," the trial court expressed concern that "there are as yet no results with which to gauge its prospects." Similarly, although the salary projections for Mother of $60,000 to $150,000

(with bonuses) were "potentially lucrative; there was no certainty with respect to the ability of the entity to eventually make that payment."

As stated above, Mother's job prospects must be more than "a mere hope or belief." *Webb*, 2009 WL 348362, at *2. They need not, however, be an absolute certainty. Contrary to the reasoning of the trial court, we find that Mother's opportunity with Mr. Younkes was not speculative or uncertain enough to justify the trial court's decision. Mr. Younkes had experience with start-up companies and had already contributed substantial capital and raised additional capital for the venture at issue. Moreover, Mother had developed other job opportunities in Colorado. She was offered a job with Ethos as Director of Marketing and Consulting but had to decline the offer because of this litigation. She began a job with VITAL Marketing but lost the job because she was under a court order to return Triston to Chattanooga. There is no evidence to suggest Mother could not find other such opportunities in Colorado if necessary. Mother testified that the only job she found in the Chattanooga area (including North Atlanta), out of the hundreds of jobs for which she applied, was a job at ADS Security paying $45,000 a year. Mother testified that the cost of living in Littleton, Colorado was only slightly higher than the cost of living in Chattanooga.

This case is similar to *Redmon v. Redmon*, 2014 WL 1694708, at *6-7, in which the mother found a job in another state and the father produced no evidence of jobs in the home county. The court in *Redmon* stated:

> [C]omparison of Mother's job opportunities in the McNairy County area to Mother's job offer in Oxford [Mississippi] is relevant to the question of whether her proposed relocation is for a reasonable purpose. . . . As the party with the burden of proving lack of reasonable purpose, however, the onus was on Father to produce evidence from which such a comparison could be made. Mother testified that nurse practitioner job positions available in the general McNairy County and Jackson, Tennessee areas were not suitable for her, that they were either temporary positions or included requirements she did not meet. In response, Father proffered only his own testimony criticizing Mother for not applying for nurse practitioner positions near McNairy County and speculating that "surely" there were such nurse practitioner jobs available in his area. This does not suffice to meet his burden of proving that Mother's proposed relocation does not have a reasonable purpose.

*Redmon*, 2014 WL 1694708, at * 7 (footnote omitted). The *Redmon* court concluded that the evidence preponderated against the trial court's finding that the proposed relocation did not have a reasonable purpose. *Id.*

In this case, Father did not produce any evidence of jobs available for Mother in

- 9 -

the Chattanooga area. Father failed to prove that Mother's proposed relocation to Colorado for job opportunities was not for a reasonable purpose. We conclude that the trial court erred in finding that Mother's relocation was not for a reasonable purpose.

Vindictive Motive

Under Tenn. Code Ann. § 36-6-108(d)(1)(C), a parent's motive for relocation is considered vindictive if the move "is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child." We must determine whether the evidence preponderates against the trial court's finding that "vindictiveness was not the motivating factor for the move." We interpret this finding to mean that Mother's move was not intended to defeat or deter Father's parenting time with Triston.

Credibility is a crucial factor with respect to the trial court's determination regarding vindictiveness. Father testified to instances where he believed that Mother was attempting to keep him from seeing Triston and asserted that, if allowed to move, Mother would continue to attempt to minimize his time with Triston. Mother denied any intent to deny Father parenting time with Triston and proposed a parenting plan under which Father would have eighty days of parenting time with Triston a year, with additional time if Father wanted to come to Colorado. The trial court concluded that Mother "has always encouraged the relationship between Triston and his father and that there certainly is no pattern by [Mother] unreasonably to disrupt or refuse any parenting time that [Father] was entitled to." The trial court further stated: "Satisfactory explanations were given to the Court with respect to any misunderstandings between the parties regarding time spent with Triston by his father." The court gave the following examples:

> [Father] claimed that he was not given time with Triston this Christmas. In fact, [Mother] offered [Father] the opportunity to spend Christmas time with Triston on December 20 at the home of his fiancée, but [Father] indicated that he would be working and the festivities at his fiancée's home would occur after it was necessary for Triston to return to his mother to be able to fly to Denver, Colorado on a 5:00 a.m. flight the next morning. Likewise, with respect to the end of the Christmas [vacation], there was confusion as to whether [Father] would be in Chattanooga on the exchange date, since he indicated to [Mother] that he would be in Louisiana at least until 7:00 p.m. on December 27, the exchange date.

In light of the trial court's crediting of Mother's testimony, we conclude that the evidence does not preponderate against the trial court's finding that Mother's motive in moving was not vindictive.

Because we have determined that Father failed to prove any of the grounds required under Tenn. Code Ann. § 36-6-108(d)(1) to prevent Mother's relocation, we

need not address Mother's arguments regarding best interests or her motion to dismiss.

Attorney fees

Mother further requests that this Court award her attorney fees pursuant to Tenn. Code Ann. § 36-6-108(i), which provides: "Either parent in a parental relocation matter may recover reasonable attorney fees and other litigation expenses from the other parent in the discretion of the court." We decline to award Mother attorney fees for this appeal.

CONCLUSION

The judgment of the trial court is reversed and the case is remanded for further proceedings consistent with this opinion. Costs of the appeal are assessed against the appellee, Michael J. Mouton, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE